**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | . |
| | . |
| Plaintiff, | . CR No. 17-0197 (TSC) |
| | . |
| v. | . |
| | . |
| HOLLIE ANN NADEL, | . Washington, D.C. |
| | . Monday, September 9, 2024 |
| Defendant. | . 11:15 a.m. |

. . . . . . . . . . . . . . . . .

**TRANSCRIPT OF SENTENCING**
**BEFORE THE HONORABLE TANYA S. CHUTKAN**
**UNITED STATES DISTRICT JUDGE**

<u>**APPEARANCES:**</u>

| | |
|---|---|
| **For the Government:** | **KONDI J. KLEINMAN, AUSA** |
| | **U.S. Attorney's Office** |
| | **601 D Street NW** |
| | **Washington, DC 20530** |
| | |
| **For Defendant:** | **JAMES M. TRUSTY, ESQ.** |
| | **A. JEFF IFRAH, ESQ.** |
| | **IFRAH, PLLC** |
| | **1717 Pennsylvania Avenue NW** |
| | **Suite 650** |
| | **Washington, DC 20006** |
| | |
| **Court Reporter:** | **BRYAN A. WAYNE, RPR, CRR** |
| | **U.S. Courthouse, Room 4704-A** |
| | **333 Constitution Avenue NW** |
| | **Washington, DC 20001** |

**Proceedings reported by stenotype shorthand.**
**Transcript produced by computer-aided transcription.**

P R O C E E D I N G S

THE DEPUTY CLERK:  We're on the record in criminal case 17-197, the United States of America versus Hollie Nadel. Starting with government counsel, please approach the podium and state your appearance for the record.

MR. KLEINMAN:  Good morning, Your Honor.  Kondi Kleinman for the United States.  I'm joined at counsel table by FBI special agents Mike Major and Nick Burda, and my paralegal Sona Chaturvedi.

THE COURT:  Good morning.

MR. TRUSTY:  Good morning, Your Honor.  Jim Trusty and Jeff Ifrah on behalf of Hollie Nadel, who is present at counsel table as well.

THE COURT:  Good morning.  Good morning, Ms. Nadel. You've been in my courtroom, but I don't think you've appeared in front of me.  Good morning.

THE DEFENDANT:  Good morning.

THE COURT:  All right.

PROBATION OFFICER:  Good morning, Your Honor. Sherry Baker on behalf of the probation office.

THE COURT:  Good morning, Ms. Baker.  And just in the interest of full disclosure, Mr. Trusty and Mr. Kleinman, I did meet very briefly with Ms. Baker.  I always like to tell the parties if I speak with probation in advance of the hearing.  And I did meet with Ms. Baker very briefly this

morning, simply to determine from the Bureau of Prisons how much time Ms. Nadel had already served and that she would get credit for in a sentence, as well as what that would factor in with your requested sentence of a year and a day.  I assume you did that because you get good-time credit if it's more than a year, so a year and a day would give her that good-time credit, while 12 months would not.

So I did ask her about that, and she did say that, having spoken with the Bureau of Prisons, the estimation is that with the sentence that the government is requesting, with good-time credit as well as the time already served, it would result in eight months.  So I just wanted to let the parties know that that's what I found out and that's the information I'm operating under.  Not that that's what I'm going to impose, just that that is my basis of information.

All right.  So we're here for the sentencing of Ms. Nadel. Now, I didn't take your plea.  This case was originally Judge Sullivan's.  And I agree with Judge Sullivan, who has had way more experience as a judge than I have, that this is the strangest case I've ever had.

I think Ms. Nadel is the second to last -- is that right? -- defendant to be sentenced in this very bizarre case. She has pleaded guilty to conspiracy to commit bank fraud and money laundering in violation of 18 U.S.C. § 371.

And Ms. Nadel, you have family here in court today?

THE DEFENDANT:  Yes, I do, Your Honor.

THE COURT:  And they're in the first two rows?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Good morning.  And I'm sure she appreciates you being here.

All right.  In preparation for the sentencing, I have received and reviewed the presentence report and the sentencing memorandum, which are ECF Nos. 80 and 90, from the probation department, and the following documents submitted by counsel in advance of the hearing: the plea agreement and statement of offense that were signed by Ms. Nadel, as well as the parties; the government's sentencing memorandum; Ms. Nadel's sentencing memorandum; the exhibits and the compiled character letters, which I note were filed late, but I did manage to review them, as well as a video exhibit in support of Ms. Nadel, which I assume -- did you get that, Mr. Kleinman?

MR. KLEINMAN:  Yes, Your Honor.

THE COURT:  All right.  Again, that was late, but I've reviewed them.

All right.  Is that it?  Have I covered everything that has been submitted to me, Mr. Kleinman?

MR. KLEINMAN:  Yes, Your Honor.

MR. TRUSTY:  Yes, Your Honor.

THE COURT:  Let me address the pending motion to seal

the defense sentencing memorandum.  Defense counsel moved to file Ms. Nadel's sentencing memo under seal until today, September 9, because it includes sensitive information that should not be publicly disclosed.  The motion also anticipates that I will revisit the motion at today's sentencing.

Are you requesting the memo remain sealed following the sentencing?

MR. TRUSTY:  Just very briefly, Your Honor.  And it's really not so much about cooperation, which has been a public acknowledgement for a while in this case, but there are some pretty sensitive things I'd like to just have a brief opportunity to redact, maybe overnight, if we could have another day or so on the sealing.

THE COURT:  Sure.  Do you have an objection, Mr. Kleinman?

MR. KLEINMAN:  No, Your Honor.

THE COURT:  My presumption is always, you know, that these are public matters, the public has a right to access all filings in all cases, but I do make exceptions for private medical information, which includes any mental health or personally identifying information.

So I will give you a chance, Mr. Trusty, to make a redaction.  If you could show it to the government to see if they have any objections, and then file it with me and let me know if the government has any objections, that will make it a

lot easier for me to rule on that motion.

MR. TRUSTY:  Yes, ma'am.

THE COURT:  Okay.  In fact, I don't think you need to file the actual memo, the legal document under seal.  It's the attachments you're talking about redacting, is it?

MR. TRUSTY:  I think there might be a couple of things within the memo too, though, Your Honor.

THE COURT:  Okay.  I'll give you till close of business tomorrow.

MR. TRUSTY:  Thank you.

THE COURT:  All right.  Let me begin with the presentence report.  The final presentence report and sentencing recommendation were filed in this case on August 30 of this year.

Mr. Kleinman, does the government have any objection to any of the factual determinations set forth in the presentence report?

MR. KLEINMAN:  No, Your Honor.

THE COURT:  Are you expecting an evidentiary hearing today?

MR. KLEINMAN:  No.

THE COURT:  Okay.  Ms. Nadel, are you fully satisfied with the services of your attorney in this case?

THE DEFENDANT:  Yes, I am, Your Honor.

THE COURT:  All right.  Do you feel you've had enough

time to talk with him about the probation department's presence report and the papers that were filed by the government in connection with the sentencing?

THE DEFENDANT:  Yes, I do, Your Honor.

THE COURT:  Mr. Trusty, have you and Ms. Nadel read and discussed the presentence report?

MR. TRUSTY:  We have.

THE COURT:  Are there any disputed issues of fact? That is, does Ms. Nadel have any objection to any of the factual statements set forth in the report?

MR. TRUSTY:  We had initial objections; we think they've been satisfied.  We have no remaining objections.

THE COURT:  Good.  All right.  Hearing no remaining objections, I will accept the factual recitations in the presentence report regarding the circumstances of this offense.  And therefore, the facts as stated in the presentence report will be my findings of fact for the purpose of this sentencing.

Now, the presentence report lays out the probation office's calculation of the advisory guideline range that applies in this case.  This calculation was done using the 2023 guidelines manual.

Ms. Nadel, I always pause here when I have individuals before me -- or I often do -- who have not previously been in the criminal justice system like yourself.  The sentencing

guidelines used to be binding on us judges; we had to give the sentence prescribed in the sentencing guidelines.  That is no longer the case.  But we must consult the guidelines in every criminal case to which they apply.

And it is a very -- the guideline calculation is quite formulaic.  It involves numbers and sections and statutes, and upward departures and downward departures and variances and so forth.  And it can sound very mathematical and impersonal. But it is an exercise that we must go through that takes into account your criminal history, the seriousness of the case, any aggravating factors.

In the end, though, there is a human being who is being sentenced, and I do -- that is of paramount importance to me. So I don't want you to be given the impression that we're throwing these numbers into a pot and somehow coming out with a sentence for you.  That is just the starting point.  Do you understand?

THE DEFENDANT:  Yes, I do, Your Honor.

THE COURT:  Okay.  Let us begin with the guidelines offense level.  The applicable guideline in this case is §2X1.1(c)(1), which directs the Court to apply the guidelines for the underlying substantive offenses.  The applicable guideline for bank fraud is §2B1.1, and the applicable guideline for money laundering is §2S1.1.

The underlying offenses are grouped pursuant to §3D1.2(c)

because Ms. Nadel pleaded guilty to conspiracy both to commit money laundering and to commit bank fraud, which is the underlying offense from which she derived the laundered funds.

The comments to the guidelines for money laundering at §2S1.1, Note 6, direct me to group these two underlying offenses. I will calculate the offense level under guidelines §2S1.1 as the presentence report recommends because it produces the highest offense level.

Under guideline 2S1.1(a)(1), the base offense level is determined by the underlying offense that produced the laundered money, in this case bank fraud, and guidelines §2B1.1. Under 2B1.1(a)(2), the base offense level is 6, but Ms. Nadel's offense includes several characteristics that add to the offense level.

First, the loss to the company victims in this case exceeded $3.5 million, so 18 levels are added pursuant to §2B1.1(b)(1)(D).

Second, because Ms. Nadel's co-conspirator, Daniel Zancan, stole from his employers, and as a result his employers suffered substantial financial hardship, the offense level is increased two levels per §2B1.1(b)(2)(A)(iii).

Third, even though Ms. Nadel did not ultimately receive a financial benefit from the extortion scheme, she derived more than $1 million from the scheme and receives another two-level increase per §2B1.1(b)(17)(A).

And fourth, and finally, Ms. Nadel receives a two-level enhancement for obstruction of justice under guidelines §3C1.1 because she provided false information to the FBI and married Gina Rita Russell in an attempt to prevent them from testifying against them using a spousal privilege.  That marriage has since been annulled.

This brings the offense level to 30.  But the government also represents that Ms. Nadel has demonstrated acceptance of responsibility in a manner that entitles her to a two-level reduction under §3E1.1(a), and she has assisted authorities in the investigation and prosecution of this matter in a manner that entitles her to an additional one-level reduction under §3E1.1(b).

Although conduct that results in the obstruction of justice enhancement that Ms. Nadel received ordinarily indicates that the defendant has not accepted responsibility for her conduct, there may be extraordinary cases in which adjustments for both obstruction of justice and acceptance of responsibility apply.

Probation recommends, and the government does not dispute, that this is one of those situations that is extraordinary. The acceptance of responsibility mitigating factor is designed for individuals who voluntarily terminate their criminal conduct, who pay restitution prior to a plea or trial, and who show real efforts toward rehabilitation.

I note I did not apply this reduction in the case of Gina

Rita Russell, because she had done none of those things. But Ms. Nadel has not only stopped her criminal conduct, but worked very hard, as the materials submitted to this court indicate, worked very hard to rehabilitate herself and now works to advocate for human trafficking victims, which I don't think anyone will dispute she was one.

I will therefore apply the three-level reduction and therefore find that before I consider any departures or variances, Ms. Nadel's total offense level is 27.

Are there any objections to my calculation of the offense level, Mr. Kleinman?

MR. KLEINMAN:  No, Your Honor.

THE COURT:  Mr. Trusty.

MR. TRUSTY:  No, Your Honor.

THE COURT:  All right.

All right.  I'm going to turn to the criminal history category.  The presentence report has found that Ms. Nadel has no prior convictions that receive criminal history points in the guidelines manual, and therefore has a criminal history points subtotal of zero.  This puts her in criminal history category I.  Any objections to the criminal history calculation, Mr. Kleinman?

MR. KLEINMAN:  No.

MR. TRUSTY:  None, Your Honor.

THE COURT:  All right.  Based on the offense level and

the criminal history category I've just discussed, the guidelines calculate the sentencing range to be 70 months to 87 months of imprisonment.  However, as the presentence report notes, the statutory maximum is five years.  Because five years is less than the minimum of the applicable guideline range, the correct guidelines term is 60 months.  Any objection to that?

MR. KLEINMAN:  No, Your Honor.

MR. TRUSTY:  No, Your Honor.

THE COURT:  Having determined the applicable guidelines range, the next step is for me to consider departures.  The probation office has identified a potential downward departure under guidelines §5K2.12.  That provision provides that when a defendant commits an offense because of serious coercion, blackmail or duress, the court may depart downward.

The presentence report notes that Candy Evans directed much of Ms. Nadel's post-offense conduct, including directing her to lie to the FBI and to sign a false confession that implicated herself and exonerated the rest of the Evans-Kaslov family.  The presentence report also notes at paragraph 184, that it is plausible that Ms. Nadel may have been coerced or under duress when she provided the false information to the FBI.

The probation office has also identified factors that may warrant a variance, as opposed to a departure, from the

guidelines range.  It advises that if I do not apply a downward departure for coercion, I could also consider the duress Ms. Nadel was under in the context of a variance.

Probation also notes that Ms. Nadel was physically and emotionally abused by Ms. Russell for years, forced into a life of prostitution and domestic servitude to support Ms. Russell's family, and that she did not personally profit from the extortion scheme.

Ms. Nadel's counsel has made an argument that I should vary from the guidelines range to impose a sentence of probation, which I'll address later.

Mr. Trusty, are you requesting the downward departure, or are you simply requesting that I vary downward?

MR. TRUSTY:  Varying downward because the plea agreement did not allow for argument for departure, other than the 5K1.1.

THE COURT:  That's right.  And -- just a minute. Excuse me.

(Court conferring with staff.)

Sorry.  All right.  I'm going to address this now because I think that way we don't have to deal with it during allocution.

Mr. Kleinman, you have moved for a downward departure under §5K1.1 based on the circumstances of this case and Ms. Nadel's substantial assistance in prosecuting her co-conspirators.  I

understand by virtue of that motion you're seeking a sentence of 12 months and one day of incarceration, followed by one year of supervised release.  Is that correct?

MR. KLEINMAN:  That's correct, Your Honor.

THE COURT:  I assume you have no objection to that motion, Mr. Trusty?

MR. TRUSTY:  No, Your Honor.

THE COURT:  All right.  I'm going to grant the motion for the downward departure.

Now, with regard to the statutory framework, § 3553 requires me to consider a variety of factors, including the sentencing range the guidelines prescribe, which I've just discussed, as well as the applicable penal statutes.  The charge of conspiracy to commit bank fraud and money laundering in violation of 18 U.S.C. § 371 carries a statutory maximum penalty of five years of imprisonment.  Because of the charges in this case as stated in the information, there's no mandatory minimum applicable.

Ms. Nadel is eligible for one to five years of probation under the relevant statutes but is ineligible for probation under the guidelines.  If a term of imprisonment is imposed, the statutes provide that Ms. Nadel faces a supervised release range following imprisonment of not more than three years, while under the guidelines that range is one year to three years.  The relevant statutes set a maximum fine of up to

twice the loss caused by the offense, in this case $8,435,085.72.  The guidelines fine range is between $25,000 and $250,000.  A special assessment of $100 is mandatory -- $50 for each felony count -- and the statutory and guidelines restitution provisions are applicable because there are multiple identified victims.  Pursuant to 18 U.S.C. § 3663A, I must determine the amount of restitution owed.

As part of Ms. Nadel's plea agreement, the government agreed that it would not seek more than $4,217,542.86, the loss to Daniel Zancan's employers, R&R Mechanical, 2902 Bladensburg Road, LLC.  The government seeks that amount, and I concur with the presentence report that imposing the full amount of the victim's loss is mandatory under the statute. And that comes from *United States v. Bikundi*, 926 F.3d 761, at 790 to 91, which held that the Mandatory Victims Restitution Act requires courts to order restitution in the full amount of the victim's loss, without consideration of the economic circumstances of the defendant.

I note that the defense sentencing memo highlighted the unfortunate reality that the financial history and employment opportunities of the Evans-Kaslov family make it unlikely that those individuals will make significant contributions to the amount of restitution owed beyond the property already seized from them.  Which I totally agree with.  I have seen nothing in the record to indicate to me that the members of that

family will ever, ever seek lawful, gainful employment.

And therefore, the unfortunate reality is that even though there's joint responsibility for the amount of restitution, the money, any money that is recovered because of the restitution order will come from Ms. Nadel's efforts, which appears to further punish her. But we'll discuss that in a moment further.

Again, the memo points out the irony that Ms. Nadel will ultimately pay back much of the money that the Evans-Kaslov family coerced her into obtaining and then enjoyed for their benefit. I take that into consideration. And I note that in *United States v. Gooding*, which is 19 CR 0255, which the circuit affirmed earlier this year, which was my case, the government sought more than $2 million in restitution. I noted that although the Mandatory Victims Restitution Act restricts my discretion in setting the amount of restitution, the statute expressly authorizes discretion in fashioning how a defendant is required to pay. And this is quoting from now-Justice Jackson, who wrote the opinion in that case. So I will set a payment plan based on my assessment of Ms. Nadel's ability to pay.

I also note that Ms. Nadel agreed to forfeiture pursuant to the consent order of forfeiture, which was ECF No. 53. However, the government has elected not to seek forfeiture from Ms. Nadel and asks that I vacate the consent order of

forfeiture signed by Judge Sullivan on May 7, 2018.  Assuming there's no objection from defense counsel, I will vacate that order.

MR. TRUSTY:  No objection.

THE COURT:  So counsel, have I stated accurately the statutory and guideline framework under which we're operating here?  Mr. Kleinman?

MR. KLEINMAN:  Yes, Your Honor.  One clarification.  I think you said that she's pled guilty to two charges and that there was a special assessment of $50 for each.

THE COURT:  One charge, $100.  I'm sorry.  You're right.  $100.

MR. KLEINMAN:  I realize that doesn't make a difference.

THE COURT:  Well, I want to make sure the record is correct.  That is true, you pled guilty to one count, for which there's a $100 mandatory assessment.

MR. KLEINMAN:  And one other point.  You said that Ms. Nadel and Mr. Zancan are the last two defendants.  There's a ninth defendant, James Padilla, who's --

THE COURT:  Who's a fugitive.

MR. KLEINMAN:  -- lingering out there.  Mr. Kramer and I have had discussions about a way forward in his case.  So we're working through that.

THE COURT:  Thank you for that amendment.  That is

true.  There is one defendant who remains at large, Mr. Padilla, who has not yet been arrested.

All right.  Now, before I discuss the other sentencing factors that will bear on my final decision, I will state for the record, which the parties already know, the sentence that the probation office has recommended, taking into account all the factors, including the guidelines range.  The probation office recommends 36 months of incarceration, three years of supervised release -- that is 36 months of supervised release -- restitution in the amount of $4,217,542.86, and no fine.

Now, the other thing that Ms. Baker confirmed this morning when I spoke with her is that recommendation was not -- was made before the government filed its 5K1 letter.  So that did not take into consideration the government's request for a downward departure.

Okay.  At this point, I will give the parties an opportunity to address the court.  Mr. Kleinman?

MR. KLEINMAN:  Thank you, Your Honor.  And just to be clear, Mr. Padilla's case is in fugitive status, but he's in Los Angeles, and Mr. Kramer knows where he is.

THE COURT:  Oh, okay.

MR. KLEINMAN:  We're trying to work towards --

THE COURT:  So I'm not even close to being done.  But apparently I have time.

MR. KLEINMAN:  Your Honor, unfortunately, there's also going to be a contested forfeiture -- we think there's going to be a contested forfeiture hearing in this case with several people, and so it looks like it will keep going --

THE COURT:  I've had a few of those, so, yeah.

MR. KLEINMAN:  -- for quite some time.

THE COURT:  I'll let you know, I'm considering having a separate restitution hearing.  But I'll hear from you.  And I'm particularly interested, Mr. Kleinman -- and it's no secret that you know this case very well, having been on it from the beginning, along with your agents.

To call it bizarre is an understatement, but I'm sort of interested, given -- I understand why the government obviously prosecuted Ms. Nadel and why they're obviously seeking a relatively substantial sentence in this case, because she was an active participant.  But given her status also as a victim -- I mean, she wrote a victim impact statement in the sentencing of Ms. Russell -- I'm sort of curious to come around to your way of thinking on the incarceratory sentence.

MR. KLEINMAN:  It's a very tough case, Your Honor.

THE COURT:  It is.  It is very tough.

MR. KLEINMAN:  I've told you multiple times now that sentencings are my least favorite part --

THE COURT:  Same here.

MR. KLEINMAN:  -- of being an assistant U.S. attorney.

And that is especially true today.  I don't know how many times I've stood before judges during my time as a prosecutor, but between Superior Court, this courthouse, and a brief stint in EDVA, hundreds I believe at this point in time, and I don't ever recall a sentencing being as difficult as this one.

THE COURT:  That's something.  Because I've had you before me in a bunch of them.

MR. KLEINMAN:  And I've read Mr. Trusty's submission, which I agree with you was excellent.  There are points I definitely disagree with, but it's a compelling document for sure.  And I've read all of the letters submitted to the court on behalf of Ms. Nadel, including by her family members, and you can certainly see there are so many people here for her today showing support and love.

And so there's no doubt she's supported and loved by people, there's no doubt that she has done a great deal of good in her life, both before all this activity was taking place and certainly after.  I listened to a podcast she was on last week in thinking about this case.  And there's no doubt the government thinks that she's been rehabilitated.  We don't fear that she's going to go out and commit additional criminal conduct.  That doesn't seem to be an issue in this case at all.

On the other hand, there's no question that she actively participated in this extortion, fraud, and money laundering

scheme.  There's no doubt Daniel Zancan embezzled more than $4 million from his employer, there's no doubt it caused a significant financial hardship to Mr. Browning, who I noted in our memo, he doesn't believe anyone should get a break in this case based on the financial loss that he's undertaken.  And there's certainly mitigating circumstances for her, lots of mitigating circumstances.

With that said, there's no question she conned Mr. Zancan into believing that the mafia was after her and then potentially after him, that she was in love with him, that she was going to go on the run with him after he secured her freedom, and even at one point that she was pregnant with his child.  All of these things happened.  We included some of the text messages in our memorandum.  There's no question those text messages show that she definitely understood how much psychological torment Mr. Zancan was under through this.

And I think really importantly, there's no question that this scheme does not succeed but for Ms. Nadel's involvement.

THE COURT:  All true.

MR. KLEINMAN:  If you take Ms. Nadel out, Mr. Browning doesn't lose over $4 million.  If you take Mr. Zancan out, Mr. Browning doesn't lose more than $4 million.  If you take Ms. Russell out, Mr. Browning doesn't lose more than $4 million.  The other people certainly participated and helped out, but those seem like they were the three key people

that caused this loss to occur.

THE COURT:  But none of those people, other than Ms. Nadel, were subject to the kind of psychological and physical -- you know, if you want, you could call it torture. But the onslaught of constant threats of violence and -- I mean, look.  You could say that at some point she could have stopped.  I don't know.  I mean, I have never -- you know, I have seen a lot of people before me and also when I was a public defender who did unimaginable things under a combination of physical and mental coercion, things that normally most of us would go why would you do that?  I mean, it's not a novel situation.

So she is the only person in this whole mess that was actually being victimized.  Would you disagree with me there?

MR. KLEINMAN:  Well, I think Daniel Zancan was also being victimized.

THE COURT:  Well, he was definitely being pressured and coerced and made to feel that she was going to be killed and his -- yes, he was subject to certain psychological pressures, but nobody was beating him, holding him prisoner --

MR. KLEINMAN:  Completely agree.

THE COURT:  -- depriving him of sleep and food.

MR. KLEINMAN:  I completely agree with Your Honor.  And the government is not in any way trying to back away from that.  Now, as I noted in our memo, we did have government

attorneys who actually are experts within the government look at the trafficking angle, and they did not think this was consistent with that.

That's not my expertise.  I can't really weigh in on that. I know that you have lots of letters from trafficking organizations who said this is.  You obviously saw Ms. Nadel within a different situation than what I understand a lot of trafficking victims to be in with respect to her background, her education, her status in the country and things like that, but that's not to discount that she was a victim.  Whether you call it a trafficking victim or a nontrafficking victim, there's no doubt.

Like, Gina Rita Russell, she is a bad person.

THE COURT:  Yes, she is.

MR. KLEINMAN:  I don't usually come into court and say someone is a bad human being.  She is a bad human being.  Now, unfortunately for her, I think she was raised to be a bad human being, but she's there, and that's where she is.  She's chosen her lot in life at this point in time and she is a bad human being.

Hollie Nadel is not.  The government does not believe that about Ms. Nadel.  And we understand there were circumstances that definitely had her engage in activity that there's no way she would have engaged in that activity but for meeting Gina Rita Russell.

THE COURT:  So she's got a felony conviction -- I apologize.  I'm going to let you finish your allocution in a minute.  She's got a felony conviction.  It's going to result in the loss of her job.  It's going to follow her for the rest of her life.  Not only that, but we live in the age of the internet.  She will never be able to walk away or get away from what she did.  It's going to follow her always.  She did 56 days in jail.  And that's in addition to everything that she went through before.

And I am not trying to sort of ignore what she did.  But I am trying to consider it in light of what -- the circumstances in which she did it and what she has actually suffered as part of her involvement in this.

I mean, I'm trying to figure out what of the 3553(a) factors would be served by putting her back in prison.  It's not the protection of the public.  It's not the rehabilitation because she's already well underway.  It's not needed vocational treatment or anything.  It may be the seriousness of the offense because it's serious, but then it's just punishment.  And punishment, she's gotten plenty of that already.  And I'm thinking what good would it do to put her in prison for a year and a day.

MR. KLEINMAN:  So my response to Your Honor is I am not going to come up here and bang my -- figuratively bang my fist --

THE COURT: You never do that, Mr. Kleinman. You're a thoughtful person, and I appreciate that.

MR. KLEINMAN: You hit it on the head, Your Honor. The only 3553(a) factors that warrant incarceration in this case, the one you didn't say, I think general deterrence, because the government does believe there were opportunities -- you know, she had it horrible, horrible, completely agree.

But there were opportunities -- in her letter to the court she mentions at some point Gina Russell's in California and she's on the other side of the country. Or when she's with Daniel Zancan, she's obviously not with Gina Russell at that point in time. So there were opportunities, the government thinks, to take a different set of actions. So general deterrence is one, and the only other one is the seriousness of the offense.

With that said, you're a hundred percent right. The other factors weigh in favor of probation. So I'm not going to come up here and say, Your Honor, you must impose 12 months and a day or it'd be a grave injustice. I don't believe that. I think Mr. Trusty has outlined really compelling arguments. The letters that have been submitted on her behalf have outlined really compelling arguments. The government has to weigh that with the actual criminal conduct itself, because we are not seeking any sort of charges for sex work at all. That wasn't what this was about.

THE COURT:  I should hope not.

MR. KLEINMAN:  This was about a fraud scheme.  And you have a victim who obviously doesn't believe that people should be granted mercy in this case.  And I will tell you, we're going to ask for a more serious sentence for Daniel Zancan when we come back before Your Honor in a couple of weeks.

But we just try to get it right.  Make a recommendation.  And sometimes the government comes in too low, sometimes the government comes in too high, sometimes the government gets it just right.

You're in the position, with having seen so many cases in your career, both as a public defender and as a judge, that you have all that background to take into account.  And I gotta take into account my background, my office's background, my supervisor's background, but you're not going to get me to say, Judge, if you give her probation, what a grave injustice or mis-justice to the world.  I'm not going to say that.

THE COURT:  All right.  Thank you, Mr. Kleinman.  I always appreciate, you take a very thoughtful approach in all the cases you have in front of me, and I think the government has a reasonable basis for its request.  And I appreciate that.

Mr. Trusty.

I will say this, Mr. Kleinman.  I don't think I ever in all the time I've been a judge have ever thought back to a

sentence and thought I could have given them more time. Ms. Russell?  I do think that.  I will say that.

MR. KLEINMAN:  Your Honor, if I can file a motion for reconsideration in that case.

(Laughter.)

MR. TRUSTY:  We'll consent.

THE COURT:  I think almost everyone -- I really do believe people are capable of redemption.  I don't know that I get there with Ms. Russell.  But we're past that now.

MR. TRUSTY:  We have some hope another federal judge will have an opportunity to see her as well.

THE COURT:  That's true.

MR. TRUSTY:  I don't know if Brandi will travel, but at least the client might.

Your Honor, if I may, I've got about I guess a total of maybe four or five topics.  I'm certainly not trying to repeat the sentencing memo.

I would like to start with the court's permission with allowing Mr. and Mrs. Nadel to briefly address the Court. They are two of the 17 or 18 that submitted letters.  They're not trying to repeat their letters but just a few comments from them I think would be helpful.

THE COURT:  Okay.  Very briefly, yes.  Come on up.

MR. TRUSTY:  I'm going to let them both come up, but we'll have Susan Nadel give her statement first.

THE COURT:  That's fine.

Oh, my goodness, you look just like your daughter.  Good morning.

MRS. NADEL:  Good morning.

THE COURT:  Would you state your name for the record.

MRS. NADEL:  Susan Nadel.

THE COURT:  And your name, sir.

MR. NADEL:  Stanley Nadel.

THE COURT:  Good morning.

MRS. NADEL:  Thank you, Your Honor, for allowing me to speak on behalf of our daughter Hollie.  I stand before you heartbroken that we are here in this place today.  Seven years ago when Hollie was arrested and we learned for the first time not only that she was alive but also the horrific details of her enslavement by the Gina Russell family over a period of eight years, I had thought then, naively, that her story would be told and the real criminals would be punished, as they had profited handsomely from her forced labor and human trafficking while she was living out of a suitcase with little money to feed herself.

We learned of the physical abuse and terror-inducing verbal abuse she sustained in order to fulfill Gina and her family's insatiable appetite for luxury goods.  We also learned that they uncovered the key to controlling Hollie: threatening harm to her family.  She would do anything to protect us.

I think it's clear that Hollie is the definition of a survivor.  She endured too many years at the hands of a sociopathic crime family, seeking only to exploit her, as they themselves are illiterate and unskilled, by choice, with no means of support other than preying on the vulnerable.  Yet, in spite of this, she miraculously survived and has found the inner strength to thrive and give back to a community of fellow survivors.

She has become a force for good.  I am in awe of her strength and could not be more proud of her.  As her mother, I appeal to your sense of fairness.  She has already given 15 years of her life to this ugly chapter.  I feel that her redemption began the day she was arrested, and it breaks my heart to think that she may be punished further.

I ask Your Honor as a judge and a mother to view the full picture and this painful journey that we have all made, and please allow us to continue healing and moving forward in a positive way.

THE COURT:  Thank you.

MR. NADEL:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. NADEL:  And thank you for giving us the opportunity to speak today on behalf of our daughter, Hollie.  In August of 2009, Gina Russell and her family took advantage of Hollie, which led to more than eight years of physical and mental

abuse, threats, violence, slave labor, human trafficking, sleep deprivation, continuous fear, among other threats to our family, assaults and rape.  To describe this as a living hell is an understatement.

My entire family has been victimized by this, Your Honor. I received calls at home.  I received calls in my office from Candy Evans saying horrible things, saying that Hollie was being prostituted and trafficked.  I could hardly believe her because they were such lying scam artists, this entire family. But she even said she was a private investigator and wanted to extort more money from me to try to help Hollie.  She said her name was Amy Collins.  I recorded a few of those calls, as I knew who it was that was calling me.

I gave in to giving money to Hollie because I was -- I heard the horror in her voice, the torment.  I was afraid they would hurt her.  I was afraid she would kill herself if I didn't continue giving this family this money.  And I did not know how to separate her.  In fact, the Thanksgiving in 2016, Hollie called me for the first time in many years.  We didn't know whether she was dead or alive.  It was horrible and horrific for our family.

We agreed to meet, and I was hoping to get her away from this horrible crime family.  The next day, Hollie was assaulted.  And I didn't hear from her today.  Had we had that meeting, we would not be in this court today.  This was before

all of this occurred.

This family took everything from Hollie. And although they have been sentenced, they can never give back the years Hollie lost. She was 24 at the time they met. These years should have been some of the best years of a young woman's life. They robbed her of her career, friends, family, and her body. The loss of the first eight years of victimization followed by the arrest in 2017, and the next seven years, which included 56 days in the D.C. jail with the most violent offenders, home detention with monitoring for over one year and calls every week have punished her, prohibited her from completely moving on from this unimaginable, horrific ordeal.

As you can see, Your Honor, in the back there are many highly respected individuals here today who are expert in human trafficking. They have interrupted and changed their busy schedules to come here today in support of Hollie. Many of them have written letters to Your Honor and U.S. Attorney Graves.

As experts in human trafficking and getting to know Hollie through her advocacy work to support survivors of trafficking, as they learned of her case and looked into the specifics, they wanted to stand up for Hollie and wrote the letters confirming as experts that she is truly a victim of human trafficking.

As a father and a victim of the Russell-Kaslov-Evans

families, I appeal to Your Honor to take everything you've heard and consider no jail time, as Hollie did not receive any of the proceeds, lived out of suitcases, and often didn't have enough money for food.

A video statement from a young woman in California who was also trafficked by Gina and her family was submitted to the government and I believe Your Honor.

THE COURT:  I've seen it.

MR. NADEL:  This articulate woman told the same story as Hollie and how she was manipulated and victimized by Gina. Hollie and this young woman are the same.  They are both victims and were trafficked.  It was extremely difficult for her to do this, but she came forward after seeing this case and wanted to help Hollie's defense and prove that her story is credible.  I hope you had the time to watch this video statement as it's quite compelling, powerful, and she credits Hollie for saving her life.

Hollie would be with us, she would receive a text from Gina, and her entire demeanor would change.  The look of terror in her eyes, her body would contort, and she'd have to leave immediately.  I believe Gina was doing this because she wanted Hollie to spend more time with us to get more money for her so-called mental health treatment, but was afraid we might rescue her.  So she would call her back.  And Hollie had to comply for fear of further punishment and assaults.  Mental

and physical abuse.  This was happening for five-plus years.

THE COURT:  You have just another minute or so, Mr. Nadel.

MR. NADEL:  I'm sorry?

THE COURT:  Do you have a lot more?  Because you just have another minute --

MR. NADEL:  No.  I mean, I do but --

THE COURT:  I've read your submissions and --

MR. NADEL:  I will just read you my last, if I may.

THE COURT:  Yes.

MR. NADEL:  Thank you for indulging me, Your Honor.

THE COURT:  Yes.

MR. NADEL:  Hollie is more valuable to society to continue her mentoring, advocacy work, presentations before lawmakers, support for survivors, educating financial institution, and the good work she has done.  We are so proud of her and grateful how she has turned her life around to be a positive force --

THE COURT:  Okay.  I know you're reading, but my court reporter is having to keep up with you, if you could slow it down while you're reading.

MR. NADEL:  Oh, I'm sorry.

THE COURT:  Thank you.

MR. NADEL:  And especially thankful that Gina and the Russell-Evans-Kaslov families did not break the essence of the

beautiful woman she was and has become.  Truly her future is in your hands, Your Honor, and I thank you for giving us the time today to speak on her behalf.

THE COURT:  Thank you.

MR. TRUSTY:  Your Honor, I would like to spend a couple of moments just talking about support because that's an important part of Ms. Nadel's future.  And I'm not going to go name by name --

THE COURT:  Right.  I want to tell the parties, and I don't want to cut anybody short.  We can resume after, but I do have a hard stop.  We have a judges' gathering at 12:30, so I have a hard stop at 12:30.  So that gives us 30 minutes.

MR. TRUSTY:  I'll make it work on my end at least.

THE COURT:  I will too.

MR. TRUSTY:  Hopefully leave you time to make findings. Your Honor, a couple of things worth mentioning.  You've heard from Mr. and Mrs. Nadel, and I think it really tracks a lot of the Court's comments already this morning in terms of how damaging and how horrific Hollie's existence was for such a long time.

You talk about this being an unusual case.  It certainly is.  And having a person in a case that spanned many months of fraudulent activity who never got a penny out of it, just that starting point is such an unusual conspiracy.  To say that she's truly involved in some sort of knowing and voluntary

way -- and I know Mr. Kleinman is a reasonable man.  I have no ill will towards the agents or the AUSA in this case.  They're good guys.

I disagree with how they kind of read text messages and how they read voluntariness into things that aren't particularly voluntary.  But at the end of the day, you've got such an extraordinary moment of a case, and it really comes down to a very narrow question of does general deterrence, whatever that always amorphous concept means, does that somehow mean that Hollie Nadel should go back to jail after seven years of a complete turnaround in her life, of freeing herself, of doing wonderful things.  And that's what leads to this support.

When I was a prosecutor in Greenbelt, I had I think several death penalty prosecutions where zero, one, or two supporters would show up for the defense.  And maybe there's some cause and effect there to think about, but it was an extraordinary thing to see that in something that important that almost no one would show up on behalf of the defense.

In this case you've got friends and family, you have a number of people who wrote letters to the Court that I know the Court has reviewed carefully, as the Court always does.  You've got a number of experts from entities like the Human Trafficking Legal Center, Polaris, probably four others that I could rattle off.  You've got support coming in from afar from a similarly situated victim who's probably more of an expert

than anyone should ever be as to the manipulation and the power and the control of the Evans family when it comes to literally enslaving people or overcoming their will.

So there's extraordinary support.  I do think that that is a good sign.  It's tangible evidence that Hollie Nadel has been making a difference in people's lives and that she'll continue to do so.

And you've got letters from folks like Martina Vandenberg, the president of the Human Trafficking Legal Center, describing this modern face of human trafficking.  And that's really what we're talking about.  Even if you look at duress and coercion law in the District of Columbia, it's kind of wedded to the old model of a pimp standing outside attacking the prostitute if she doesn't pay.

I mean, it's really kind of a physical violence, imminent physical violence model.  And that's certainly a form of human trafficking, and a horrible one, but it doesn't really reflect the psychological chains.  And even since this case broke in 2017 -- and we've put this in our memo at more length -- there's been example after example of almost like cult-like indoctrination.

So Your Honor has a letter from Dr. Lerner, who is present, for instance, that indicates this is what he sees as a cult deprogrammer that there are distinct parallels to what was happening with Hollie Nadel.  And Dr. Lerner and

Ms. Vandenberg are here, if the Court has any questions about their letters, happy to have them come up and talk.

But in some ways at the end of the day I'm not sure the Court has to fully engage in the fight between the parties as to what the extent of victimhood is. And I'll explain that in a minute. What I mean is, we have a very powerful, I think argument, that this was absolutely not a situation where Hollie Nadel was indispensable in the traditional sense to the criminal act. She was certainly present, needed, passed on the instructions that she was getting, but that's like saying that my tool is indispensable, that my screwdriver was indispensable when really it was the work crew that fixed the car.

And that's really what it comes down to. There's such a limited role or such a limited willful amount of behavior to ever even talk about, even if you take the worst text messages and try to read into them, when in fact it's more of a Pavlovian response to Gina. Gina would even tell her, make sure you say you love me in our text messages. Gina was that cognizant, that low cunning of creating a record that makes it look like this is a free-will situation, and it just simply wasn't.

So Your Honor, again, I won't belabor all the letters. I do think there's pretty extraordinary themes that come out from these letters. When you've got Susan Nadel referring to

her daughter as a hollowed-out shell, like someone took her soul, that is not hyperbole. That is a parent suffering for years. When you have Amy Nadel, the sister, who saw the pain of her parents, and really kind of held it against her sister for a while, like what are you putting Mom and Dad through? And you read in her letter that there was kind of a reluctance to accept the same types of things I'm talking about when it comes to how much Hollie was a volunteer.

And Amy came around and she ends up writing about Hollie's incredible character, and that she's risen to the challenge and that she's in awe of Hollie and how she's rebuilt her life.

Fainess Lipenga, a survivor and advocate for survivors. In fact, Judge, we have several survivors that are here in the courtroom as well. And she wrote about how Hollie would give you the shirt off her back and how Hollie just on her own decided to start knitting masks during Covid and turning them out by the hundreds for people to benefit, just the charitable heart that she described. And Lenore Bronstein just saying Hollie is my hero.

I personally thank all of these folks that wrote letters, all these folks that have taken the time to be here. I think it's important for the Court to know the depth and scope of the support that this young woman has. And it bodes so well in terms of her future and what's going to happen.

So the narrow question before the Court, I think, is essentially is it necessary to further punish Hollie Nadel with imprisonment, to return her to jail, when the government concedes there's just no risk of recidivism. And I think the Court's comments reflect that as well, that there's really no likelihood that we ever see Hollie Nadel in court unless she's here to stand next to a human trafficking survivor and help the Court in that way.

Mr. Kleinman and the government -- as the representative of the government has hung on this notion of general deterrence. And I have to say the first thought I have about general deterrence today in this issue is what's the message to actual trafficking survivors. What's the message to the people that she's mentoring, that she's helping shape legislation about, to recover their lives? I mean, what is the message they get from this return to jail -- for whatever, eight months of real time? What is the actual benefit to society for doing that?

And if we're looking for punishment -- and I think that -- you know, obviously, it's a factor, a broad philosophical factor within 3553, you can wed it to the role, the nature of the offense, for instance. But if we're looking for some form of punishment, I mean, she's lived it. And she has been subjected to the best test of recidivism, which is seven years of supervised release, starting off very tightly controlled. She had 56 days in jail. That's punishment. She had 13

months of electronic home monitoring that was replaced with the phone calls. And she's been a poster child for all of that type of release. So there is no chance of recidivism here. There really isn't.

And it was disheartening to read a government memo that said they are baffled at how she came to be in the clutches of these folks. It is in the abstract absolutely strange, baffling things, but when you really wade into it, when you hear from people like Victim 1 on that video, when you hear from experts that say this is exactly how these people do it generation upon generation -- they're not going to pay taxes or work, but they're going to learn how to manipulate people -- all of it begins to make sense.

And I think about a couple of little episodes that I think really kind of drive that home. One is the obstruction in this case. Again, just think about all the cases you've seen as a public defender and as a judge where there's some sort of conspiratorial activity and one of the conspirators who never gets a dime and lives out of a suitcase says well, I should give multiple statements on video and in writing to exculpate everybody else and blame myself. I mean, I guess there's moments of chivalry where somebody falls on the sword for someone else, but it makes no sense unless you factor in psychological chains.

And I think that's what this case really does comes down

to, that it's entirely about psychological chains. She's lived with the threat of physical imprisonment for seven years. And she'll be the first to tell you -- and she'll address the Court briefly momentarily -- that the date of the arrest was a welcome life-changing moment, that she was physically ill, that she was mentally ill from what she had gone through, that she had begun to realize just how horrific this existence was.

And you will also hear that she has remorse for people who were subjected to her use as a tool, that she feels bad for Mr. Zancan, who has his own issues to deal with when it comes to embezzling from his in-laws, but also, more importantly, the actual owners of the R&R company, the people that really lost money, with absolutely no reason to be victimized in this case, or no sort of involvement.

So there's a lot, you know, to talk about that I'm trying to be quick about. But just in terms of general deterrence, I guess I would add one other thought, which is if we're taking this notion of general deterrence to its logical limit, we're saying that a person sentenced under these circumstances -- and again, think about how incredibly unique these circumstances are. It's very hard to compare this to, like, another 371 conviction. But under these circumstances are there people in the general public who are going to say, wow, Hollie Nadel got probation and $4 million in restitution after

seven years of being on release, and 56 days credit time served, I think I'll go do that crime now? I mean, that's really the philosophical endpoint of general deterrence. It's laughable.

And when I think about the need for punishment in this case, Your Honor, again, you've heard and you've obviously taken it in very seriously in terms of her victim impact statement in Gina's case, which really characterizes this in depth, the letters that we've submitted. But at the end of the day, there's just -- it's just a different world than the government gives credit for when they recommend a year and a day. They're recommending the same sentence as Candy Evans for Hollie Nadel. There's something just inherently striking about that.

And I understand, it was presented in a very neutral way and the Court's asked questions that are certainly encouraging. But I would say that this is a case unlike any other one but one that certainly doesn't cry out for additional punishment.

I'll wrap it up with just a couple quick thoughts. The first thing is I think -- in kind of the good news department from where the defense sits, Your Honor doesn't really have to make a determination that I totally agree with everything that this Trusty guy said in his memo and everything he said in court and I disagree with Kondi. You don't really have to

resolve this really challenging philosophical debate about how much voluntariness there is in this case. Because even independent of accepting it to a hundred percent level -- and I think the Court's accepting it to some level -- that there's just no reason for punishment. I mean, just looking at the last seven years, looking at what she was subjected to, and weighing all these things and keeping it in the context of the least restrictive means to assure the community.

So again, if there's a need for punishment, then maybe it's community service, although she's already serving the community wonderfully. If there's a need for punishment from the Court's perspective, we can do electronic home monitoring again. She did 13 months of that successfully. But you can tell, even as I raise those as alternatives, it becomes almost laughable. Like, why in the world would we go back to electronic home monitoring when she did it for 13 months? And frankly, why would we send her back to jail for eight months, for a year, for whatever it ends up being under these circumstances?

She's got the felony consequences of losing a job. That job is gone. I would certainly ask the Court to consider that in terms of the restitution order, that she is absolutely ridiculously hardworking. She's going to find employment and she's going to do well. Everywhere she goes, they love her and they want her to stay forever. But the felony

conviction's going to saddle that. So whatever the Court's determination, I still think it could be -- I understand how joint and several liability works, and I appreciate the Court's comments about the other defendants' unwillingness to pay. But there are a lot of things still in the pipeline that are moving toward satisfaction of restitution through forfeiture. And that's why I thought if we had 90 days and maybe I holed back up with Mr. Kleinman, we could come up with some sort of agreement that the Court could countenance. But if the Court wants to go forward --

THE COURT: No, I think I agree with that.

MR. TRUSTY: We're just talking about the ability to pay.

Your Honor, I know that -- I will admit to the Court -- it has nothing to do with the 12:30 lunch or anything -- this is one of these cases where it is incredibly hard for a defense attorney to sit down, because I've gotten to know this woman, this family and her supporters for seven years. I feel like there are so many things I want to make sure, out of terror, that the Court understands.

THE COURT: I'm not going to rush it. And I can come back after lunch, that's fine.

MR. TRUSTY: No, I'm not trying to set up some record or complaint. I'm not. I mean, I've made my points. I've tried to react to kind of what the Court was asking. And I

think the appropriate way to end this is exactly what we normally do, which is to hear from my client, from Ms. Nadel. So unless the Court has additional questions, I'm happy to finally walk away from that microphone and let the real important person talk.

THE COURT:  Thank you, Mr. Trusty.

MR. TRUSTY:  Thank you, Judge.

THE COURT:  Appreciate your work on her behalf. Ms. Nadel, you have an opportunity to speak.

THE DEFENDANT:  Thank you, Your Honor, for giving me the opportunity to address the Court.

THE COURT:  And if you're going to use some notes, I'll just ask that you -- we all have a tendency when we read to speed up.  So just to make sure to take a measured pace so that my court reporter can keep up.

THE DEFENDANT:  Okay.  Just let me know if I'm going too fast.

THE COURT:  I will.

THE DEFENDANT:  Thank you.  There's not a day that goes by that I am not filled with regret and remorse for the day that I met Gina Russell and the rest of the Russell-Evans-Kaslov family.  I have often thought about that first interaction and how none of this would have transpired if we had never met.

I would like to personally apologize to Mr. and

Mrs. Browning, Mr. Zancan, my family, and all the other people who were harmed during these years. None of these people deserved to go through what they went through, and it is terrible to know that my actions contributed to their victimization.

I wish with all my heart that I could have been able to figure out a way to avoid what happened and stop the domino effect of victims. Regrettably, with the continuous sleep deprivation, mental and physical abuse and constant threat to me and my loved ones, I truly did not see a way out other than death or the inevitable arrest.

However, as we all know, unfortunately, I can't change the past. But what I can tell you, Your Honor, is that prior to this hellish existence for years, under this family's control, is that I lived a life that has been purely on the straight and narrow, and that is the life I have lived every day since being away from this despicable family. I have done everything in my power to rebuild my life and take actions with the utmost honesty and integrity.

You will never see me again as a defendant. If anything, you will see me as counsel. Whether it be on this side to defend the law and hopefully put traffickers away, or on this side, to furiously defend other victims of crime. This experience has given me an extreme passion for the law and the judicial system as a whole. I have spent much of these recent

years working on ways within my control to change as many systems and processes that I believe that if they weren't so broken, I would not be standing before you in this victim/defendant duality today.

I have spoken before Congress multiple times and worked with legislators and policy makers -- some of whom I'm grateful to have in this room today -- on critical anti-trafficking legislation.  I received certification in anti-money laundering so that I can train financial analysts, tellers, and branch managers on the realities of human trafficking and how they may be aware of the signs and typologies, proper steps and protocols to potentially catch predators through the financial footprint and stop another victim like myself from having to testify and become retraumatized.

I have worked hard to learn and master new vocational skills in operations and human resources, to both support myself but also to develop skill sets that could be used to help other survivors of human trafficking rebuild and move forward in their lives after the horrors that they too suffered.

Most recently, I had the opportunity to speak at the Virginia attorney general's second annual human trafficking summit in front of law enforcement, attorneys, anti-trafficking advocates, legislators, etc., and I was even

approached by the FBI to do a training for them.  I am in the process of scheduling a presentation for the University of Maryland's criminal justice department, and my goal for this presentation is to educate students who might at times be vulnerable like I was.

I'm doing everything I can, Your Honor, to truly make this world a better place.  And it hasn't been easy.  I have worked hard to counteract years of PTSD and trauma, often putting on my mental shield during the day to keep moving forward and working so hard, to have the little time I have to sleep at night be filled with nightmares.

All in all, from when I first met these deplorable human beings to the present, this has taken 15 years of the best years of my life.  These people attempted to take everything from me and for years they succeeded, robbing me of my career, my family, my body, my physical security, nearly my sanity, imprisoning me in mental chains and almost taking my life.  I refuse to give up and I have chosen to get up every single day to fight for myself and for other victims.  I am working so hard to do what is in my power to do to make this world a safer place.

Unfortunately, this felony conviction, as discussed, means the loss of my employment which I have dutifully served for almost four years.  But I assure you that I will move forward, continuing to work hard despite these obstacles to obtain new

meaningful employment.  I will continue to live a life of honesty and integrity.  I am grateful to have a wonderful support system.  As you know, many are here to support me today.

Lastly, I humbly ask you, Your Honor, to consider the words of my attorney, my parents, all the letters, and my final words to you today and allow me to move forward from this horrendous chapter and finally be free.  Thank you, Your Honor.

THE COURT:  You're welcome.  Thank you, Ms. Nadel.

I agree with Mr. Kleinman that this is the hardest part of the job.  Sentencing is my least favorite part of the job and probably most of my colleagues', and this is a particularly challenging one.

As I mentioned, I have to consider all the factors in imposing a sentence set forth in § 3553, and ensure that I impose a sentence sufficient but not greater than necessary to comply with the purposes of sentencing.  These purposes include the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.  It should also deter criminal conduct, protect the public from future crimes by the defendant, and promote rehabilitation.  I have to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the types of sentences

available, and the need to avoid unwarranted sentence disparity.

I've considered all those factors here.  And as I mentioned during my back and forth with Mr. Kleinman, I don't think there's any real danger of recidivism in this case.  This has been a long, long period from the time Ms. Nadel was arrested to today, and unlike, for example, Ms. Russell who went right back to her old ways the minute she was released, Ms. Nadel has used this time to try and make something of herself and assist others who may have been in the same position.

It does bear mentioning, though, that Ms. Nadel is fortunate to have significant resources, to have a family with resources and support, and by virtue of her education and her position in this world, access to organizations that could -- in which she could make a difference and that could assist her.  Not all victims of trafficking are so fortunate.

And unfortunately, society takes a different view, sometimes law enforcement takes a different view of women or individuals who are -- maybe have criminal backgrounds, are poor, not articulate, not able to access the kind of resources that Ms. Nadel was able to access.  But she shouldn't be punished for that fact either.  And it is to her credit that she has taken this time to try and do some good and make something positive come out of this experience.

But with regard to the nature of the offense, this is

serious conduct. A business lost $4 million. A small business. People work in that business. Families depended on that business. I think Mr. Browning has said -- you know, he has talked about what this has cost him and what it's going to cost his family. And I don't think there's any doubt in anybody's mind that the Russell-Evans-Kaslov family will never pay a dime other than what's been taken from them by forfeiture.

It's ironic that Ms. Nadel is facing a forfeiture order for money that she helped to extract from this company but never saw a dime of it.

But she -- coercion is a complex thing. We often hear about these kinds of cases and you go, you know, why would she do that? Why would she listen to somebody like Gina Russell? Why would she even come back the next day?

But what I have learned, and I'm sure what many of you in the audience know and what Mr. Kleinman probably knows too, is that under the right combination of stress, pressure, and psychological circumstances, seemingly normal people will do very abnormal things. I've seen it over many years. And the Kaslov-Evans family found someone in Ms. Nadel who they were able to manipulate and get -- convince to do things that went against everything she had been raised to believe.

And this is a woman who had no prior criminal conviction. And I'm talking now about the characteristics of the

defendant.  She has no prior criminal history.  She had no prior engagement in petty theft or drug use or any kind of illicit or dishonest behavior that would sort of say, oh, I see, you kind of took to this.  She had lived upon -- to the point she met this family, a law-abiding and productive life.

And therefore, while I take into consideration the seriousness of the offense and the lives that were affected and lost, I do agree with Mr. Trusty that she was more of an instrumentality, just like the woman in California.  I mean, you know, I do wonder how many other women or victims this family got to do this for them that never came forward.

But I don't think anyone would disagree that she is a victim in this case.  She even, as I said, submitted a victim impact statement for me to consider in the sentencing of Ms. Russell.

It is true that she engaged in actions designed to obstruct justice, the false confession, which I would note implicated her and nobody else, which is not something somebody who is trying to escape punishment would do.  The false information she gave to the FBI and so on.  But I think those actions were in keeping with the psychological pressure that had been brought to bear on her.

It is especially notable that she did not benefit from any of the proceeds of this scheme.  Had she, I would be taking a different approach.

The government reports that Ms. Nadel has debriefed with them multiple times and testified before the grand jury that returned the indictment against the Russell-Evans-Kaslov family. She was also prepared to testify at trial should that become necessary. And I do note, as I said before, that she was physically and emotionally abused by this family and forced into a life of prostitution to financially support this family's lifestyle, none of the proceeds of which she received.

In fact, what is abundantly clear to this court is that as a result of her participation and involvement with this family, Ms. Nadel's life deteriorated. Not only did she not benefit from this activity, she lost everything. That is something for someone who was raised in a comfortable home and provided all the resources that one could hope, has a college degree and employment.

With regard to the need to avoid unwarranted disparity, I have looked at the relevant statistics. I think this case is very different, sort of sui generis in terms of the circumstances, so I think disparity factors aren't as relevant here. But between 2019 and 2023 in this circuit individuals sentenced under guidelines 2S1.1 with a final offense level of 27 and a criminal history category of I served an average sentence of imprisonment of 52 months. That, though, I think is less compelling on this court given that I think Mr. Trusty

makes a point that the offense level is very, very high because of the amount of money that was stolen from this company, none of which Ms. Nadel received.  And so I do take that into account.  And I think the government did in their downward departure letter as well, as well as the substantial assistance that she provided to the government.

I do point out that in *United States v. Wickramasuriya*, W-I-C-K-R-A-M-A-S-U-R-I-Y-A, which was my case, involving embezzlement of a former ambassador from his government, the government in that case did not seek a custodial sentence and the probation office recommended a probationary sentence.  Obviously, there are many differences here, but in that particular case the defendant was either ambassador or very high in the embassy, was not subject to the kind of coercion and psychological and physical pressure that Ms. Nadel was subject to.

It comes down to in the end that this is not a case where I'm concerned about recidivism.  This is not a case where I'm concerned about rehabilitation.  Ms. Nadel is well on her way to that.  This is a case that has -- one of the factors is punishment, as Mr. Kleinman said.  And one of the factors is deterrence.  And I am a believer in the deterrent effect of sentences.  It's no secret, especially in certain characteristics of offenses, I think a message does need to be sent that certain conduct will be met with swift and serious

punishment.

But Mr. Trusty's point is also correct, which is what message does it send to other victims of trafficking who may be trying to decide whether to come forward?  And if I send this woman to jail after her being out on the streets, living a life of purpose and commitment and attempting to atone for what she did, what message am I sending to other potential victims?  That if you come forward, you're going to go back to jail.  And I don't know that taking just punishment alone, what good would it do to society to send her back to prison?  I can't see any point in that.  And I did consider it very seriously, because this is again -- it's not a small amount of money, and her conduct was over the course of a significant period of time.

But in the end, based on my consideration of all the 3553 factors -- would you stand with your lawyer, Ms. Nadel?

(Defendant complies.)

It is the judgment of the Court that you, Hollie Ann Nadel, are hereby sentenced to time served on Count 1.  You're further sentenced to serve 36 months of supervised release and to pay a $100 special assessment.

I went back and forth on home detention -- how much of this sentence should be on home detention.  You are hereby ordered to serve the first three months of supervised release on home detention.  Obviously, with being allowed to leave home for

employment, education, medical services, and so on.

The Court finds that you do not have the ability to pay a fine, and therefore waives imposition of a fine in this case. The special assessment of $100 is immediately payable to the Clerk of the Court for the U.S. District Court of the District of Columbia.  Within 30 days of any change of address you shall notify the Clerk of the Court of the change until such time as the financial obligation is paid in full.

While on supervised release, you must abide by the following mandatory conditions:  You must not commit another federal, state, or local crime; you must not unlawfully possess a controlled substance.  The drug testing condition is suspended based on the Court's determination that you pose a low risk of future substance abuse.  You must pay the special assessment imposed in accordance with 18 U.S.C. § 3013.  You must notify the court of any material change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments.  You must cooperate in the collection of DNA as directed by the probation office.

I will adopt defense counsel's request to set a separate restitution hearing to approximately 90 days, to allow for continued negotiations between the parties in terms of restitution.  But I will be ordering restitution.

The Court will impose the standard conditions of supervised

release as discussed in the presentence report.  At this point I'm not going to have any additional discretionary conditions of supervised release.

Are you recommending that the release -- the supervision be transferred?  I'm going to keep jurisdiction of the case, Ms. Baker.

Are you living in New York?

MR. TRUSTY:  No, she's living in Virginia.

THE COURT:  In Virginia?  So we can continue supervision here?

PROBATION OFFICER:  Yes.  The Court can retain jurisdiction.

THE COURT:  Okay.  Then I will retain jurisdiction and we'll continue here.

Any objection to the conditions of probation I've set, Mr. Trusty?

MR. TRUSTY:  No, Your Honor.

THE COURT:  Mr. Kleinman?

MR. KLEINMAN:  No, Your Honor.

THE COURT:  The probation office shall release the presentence investigation report to all appropriate agencies in order to execute the sentence of the Court.  Treatment agencies shall return the presentence report to the probation office upon Ms. Nadel's completion or termination from treatment.

Ms. Nadel, you can appeal your conviction to the court of appeals if you believe that your guilty plea was somehow unlawful or involuntary, or if there's some other fundamental defect in the proceedings that was not waived as part of your plea agreement.  You also have a right to appeal the sentence that I've imposed, subject to certain rights of appeal you waived as part of your plea agreement in this case.

If you choose to appeal, you must file an appeal within 14 days after the Court enters judgment.  If you are unable to afford the cost of an appeal, you may request permission from the court to file an appeal without cost to you.

As set forth in the plea agreement, the government pledged to move to dismiss the indictment against Ms. Nadel.  Do you wish to do so now, Mr. Kleinman?

MR. KLEINMAN:  Yes, Your Honor.

THE COURT:  All right.  Motion's granted, the indictment is dismissed.

Well, we don't have to talk about voluntary surrender since I've given you a sentence of time served.

Ms. Nadel, I'll be honest with you.  This morning I considered setting a partial incarceratory sentence, as well as more stringent conditions of release for your supervised release such as electronic monitoring.  I didn't do that because I couldn't see that there was a need to protect the public or a need to monitor your whereabouts that closely

given the seven years or eight years you've been on release. I will caution you that if you do violate your conditions of release, you will be back before me and I won't be taking such a view. I don't think you will, but I hope you won't.

I have given you the sentence I have given you not because I don't consider what you did to be serious. It is. It caused serious harm to other individuals. But I do take into account what you have actually suffered in this case, and I don't believe it is necessary or a good message of deterrence to other victims that you should have to go back to jail after all this time.

I did not give you a community service requirement because I believe you're continuing to do that and encourage you to do that. And you are fortunate that you are here with family and so much support because there are other victims who aren't.

In addition, I considered the fact that you have this felony conviction that will stay with you for the rest of your life, as well as the notoriety that will follow you, because of the age in which we live and the information that is available.

I always say this -- well, not always, but I frequently say this, that Bryan Stevenson, who is a much wiser person than I, often says we are not the worst thing we've ever done. And that is true in your case. You are taking steps to make amends for what you did and to get your life back together

with the assistance of a lot of people who love you.  And in that, you are very fortunate.  I hope you are able to continue that and to go forward and live a law-abiding, constructive life.  And I wish you good luck.  Is there anything else I need to address today?

MR. KLEINMAN:  Just a housekeeping matter about sealed documents, Your Honor.  The redacted information, the statement of offense, the plea agreement, forfeiture order, a docket entry related to the plea are all under seal.  We ask that those be unsealed at this time.

THE COURT:  I don't see any reason not to unseal them.  Mr. Trusty, do you?

MR. TRUSTY:  Your Honor, no objection to the unsealing.  I know that's the practice, particularly at this juncture.  One housekeeping --

THE COURT:  So I will grant the government's motion, I will unseal those documents.  Yes.

MR. TRUSTY:  I just can't remember if we dealt with this on the front end, but the temporary order of forfeiture, has that been vacated and dismissed since they've abandoned forfeiture?

MR. KLEINMAN:  Yes.

THE COURT:  Yes.  That will be vacated and dismissed.  Let us set 90 days for a forfeiture hearing, in which I encourage the parties to meet and confer in the interim so

that we... let's see.  Do you all have availability on December 9?  I have a ten o'clock matter.  And Ms. Nadel doesn't -- well, yes, she should probably be here.  If she's in Northern Virginia, she can be here.

MR. TRUSTY:  It's certainly not a hardship to be here. I might at the last minute try to waive her presence if we've talked it out, or it's settled and there's no reason for her to appear.

THE COURT:  If you do want that, confer with Mr. Kleinman, file something with me.

MR. TRUSTY:  Will do.

MR. KLEINMAN:  That date's fine for the government, Your Honor.  And I think you said "forfeiture."  You meant restitution.

THE COURT:  Restitution, excuse me, yes.

MR. TRUSTY:  I'm sorry, what was the date, Your Honor?

THE COURT:  December 9, which is a Monday.

MR. TRUSTY:  That's fine.

THE COURT:  All right.  December 9 at 11 a.m., restitution hearing.

All right.  Thank you all.  We're adjourned.

(Proceedings adjourned at 12:41 p.m.)

*   *   *   *   *   *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*/s/ Bryan A. Wayne*
Bryan A. Wayne